**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

MANDEEP SINGH                          1:18-cv-10946-NLH-JS

        Plaintiff,            **OPINION**

   v.

AT&T MOBILITY SERVICES LLC
and/or ABC Corporations 1-5
(fictitious names unknown to
the Plaintiff at this time).

        Defendants.

---

APPEARANCES:

SILVIA G. GERGES
LAWRENCE & GERGES LLC
242 WASHINGTON AVENUE
SUITE E
NUTLEY, NJ 07110
    Attorney for the Plaintiff.

KEITH J. ROSENBLATT
SCOTT CRAIG SILVERMAN
LITTLER MENDELSON, P.C.
ONE NEWARK CENTER
8TH FLOOR
NEWARK, NJ 07102
    Attorneys for the Defendant.

**<u>HILLMAN</u>, District Judge**

This case concerns Plaintiff Mandeep Singh's claim of employment discrimination by Defendant AT&T Mobility Services in violation of the New Jersey Law Against Discrimination and the New Jersey Workers' Compensation Act.  Pending before the Court

is Defendant's motion for summary judgment.  For the reasons
stated below, the Court will grant Defendant's motion.

**BACKGROUND**

The Court takes its facts from the parties' briefing, the
material facts not in dispute, and the procedural history of the
case.  The facts relevant to this case are summarized below.

Defendant AT&T Mobility Services LLC ("AT&T") hired
Plaintiff as a Retail Sales Consultant ("RSC") in New York City
in August 2006.  RSCs are unionized, hourly employees who are
required to record their work hours by logging in and logging
out through a computer system.  In January 2010, Plaintiff
transferred from an AT&T store in New York City to an AT&T store
in Sicklerville, New Jersey.  Plaintiff worked at the
Sicklerville store until his termination.

As part of his employment, Plaintiff attended annual
trainings that covered Defendant's time recording procedures.
These procedures require that employees clock in and out for
lunch breaks.  The parties dispute whether employees were told
during their training that their lunch breaks were to be thirty
or sixty minutes.  The parties agree, however, that at some
point, management indicated that employees were to take one-hour
lunch breaks.  If an employee worked through lunch, they would
be eligible for overtime pay.  The parties dispute how often

employees were permitted to work through lunch and what authorization was required to do so.

In addition to the time recording procedures, these annual trainings also informed Plaintiff of Defendant's Code of Business Conduct ("the Code") and its Equal Employment Opportunity and Harassment policies.  These policies prohibit disability discrimination and retaliation.  These policies direct employees to act with "honesty and integrity" while adhering to a "high standard of ethical behavior" and "focus[ing] on doing the right thing."  The policies also warn employees that they can be terminated for violating the Code or other policies.  Defendant's policies state that employees who violate the Code may be terminated immediately, without progressive discipline.  In contrast, Defendant's policies do not allow for immediate termination for other infractions like attendance discipline or job performance.  Plaintiff has stated that he both understood the Code and understood that he was responsible for complying with it.

Plaintiff and other RSCs were supervised by a Regional Store Manager ("RSMs").  On December 20, 2010, Plaintiff's supervisor, RSM Mark Frysztacki, placed Plaintiff on "Final Written Warning" for inaccurately reporting his time.  This warning stated that over five weeks, Plaintiff had failed to record his hours accurately thirteen times, resulting in nearly

four hours of pay for time he had not worked.  This warning also stated that Plaintiff was "expected to follow appropriate Log On/Log off procedures" and that "[a]dditional violations of this and other policies will not be accepted."  Final Written Warnings typically expire after twelve months, unless the employee takes a leave of absence during this time, in which case the expiration date is extended by the length of time of the employee's leave of absence.

In February 2013, Frysztacki addressed Plaintiff's improper timekeeping for lunch breaks again.  In August 2014, Frsyztacki again contacted Plaintiff about clocking out for his lunch breaks, stating that he saw that "this is a trend for you that must stop."  At this point, Frysztacki told Plaintiff that it was expected that Plaintiff would take sixty minutes for a lunch break unless a manager approved otherwise.  Frysztacki also informed Plaintiff that he was aware that Plaintiff had told other employees that they were only required to take thirty-minute lunch breaks.  Another employee testified that "you have to take a lunch per day.  Nobody was allowed to miss the hour lunch."

Plaintiff alleges that he was aware he needed to clock out for his sixty-minute lunch break, but that Frysztacki had authorized him to skip his lunch break when the store was busy. The parties dispute whether the store was adequately staffed at

4

all times and whether Plaintiff was told not to leave the sales floor unattended, resulting in him shortening or skipping his lunch breaks.

In October 2014, an Assistant Store Manager ("ASM") named Staci Waligorski contacted Plaintiff about his failure to clock out when he left the store to put gas in his truck.  The parties dispute Plaintiff's response during this conversation.  According to Defendant, Plaintiff claimed that others had engaged in similar behavior.  Plaintiff denies that he said anything to that effect.  In February 2015, Defendant became aware that Plaintiff was not taking his full lunch breaks.  Frysztacki addressed this issue with Plaintiff again.  The parties dispute whether other employees failed to take their full lunch breaks and received overtime they were not technically allowed to have.

In September 2015, Plaintiff received another Final Written Warning for violating the "Retail Account Access" policy.[1]  This warning stated that any further violations "will lead to further disciplinary action, up to and including termination."

Less than two months after the September 2015 Final Written Warning, Defendant alleges that Plaintiff continued to violate

---

[1] Defendant alleges that this warning was issued because Plaintiff "improperly verified the account holder as being present in the store location" and activated a line of service without the account holder present.  ECF No. 26-1, at 5.

the Code by consistently taking short lunch breaks or not
clocking out for scheduled lunch breaks, resulting in unapproved
overtime.  At this point, Frysztacki contacted his supervisor,
Jason Yu, who serves as an Area Retail Sales Manager ("ARSM").
Yu agreed that an investigation and report into Plaintiff's
misuse of company time was warranted.  An Employee Relations
Manager ("ERM") named Allison Menster assigned a Regional
Performance Manager ("RPM") named Robert John Ross to conduct
the investigation and write a report.  Typically, RPMS conduct
an investigation and interview witnesses before presenting their
findings to human resources and management for review.
According to Menster, there is usually no set timeline for
completing such an investigation.  Plaintiff refutes that this
is either Defendant's policy or general practice.

In the course of his investigation, Ross reviewed
Plaintiff's timecards, finding that between September 6, 2015
and November 8, 2015, Plaintiff had logged "22 hours and 19
minutes of overtime, of which 17 hours was from no clock outs or
short lunch breaks."  Ross also reviewed video surveillance of
the store and interviewed Plaintiff in December 2015.  During
this interview, Plaintiff acknowledged that he was aware of
proper procedure for his lunch breaks and admitted that he
failed to record a meal break at least five times during the
period under review.  During this interview, Plaintiff did not

indicate that Frysztacki had approved his work through lunch or
that he sought Frysztacki's permission.

On December 2, 2015, Plaintiff contacted Menster regarding
his concerns about Defendant's investigation into his time
recording practices.  Menster stated that she would investigate
these concerns, but ultimately did not do so.  Defendants assert
that Menster's efforts would have been duplicative because an
investigation was ongoing.

On December 5, 2015, another RSC and Plaintiff's coworker,
Matt Rizzolo, reported a potential conflict of interest to an
ASM named Kyle Koenig.  Koenig then emailed Yu and Ross about
this report.  Rizzolo reported that Plaintiff had made a
personal purchase of an iPad from a customer while working,
using the store's cash drawer to make change.  This prompted Yu
to open another investigation into Plaintiff.  Ross was assigned
to investigate this issue was well.

On December 20, 2015, while Plaintiff was opening the
store, he allegedly fell to the floor, injuring his right hand,
shoulder, and back.  Plaintiff informed Frysztacki of his fall
and together they completed an incident report.  Plaintiff filed
a claim for workers' compensation benefits shortly after.
Defendant's workers' compensation benefits are administered by
Sedgwick Claims Management Services.  In a letter to Plaintiff
dated January 19, 2016, Sedgwick informed Plaintiff that it

intended to contest the claim.  Plaintiff then filed an Employee Claim Petition with the State of New Jersey Department of Labor and Workforce Development, Division of Worker's Compensation. Plaintiff received workers compensation benefits and remained on medical leave from the end of December 2015 until August 29, 2016.

During Plaintiff's medical leave, Ross concluded his investigation into Plaintiff's time recording violations.  On January 4, 2016, Ross issued his report, ultimately concluding that "the allegation that [Plaintiff] misused company time is substantiated as there is a significant discrepancy in the number of hours worked and his explanation to substantiate his activity."  At this point, Yu sought approval to terminate Plaintiff under the Code.  Menster advised Frysztacki and Yu that the termination request should be placed on hold until Plaintiff returned to work from his medical leave, which Defendant states was common practice.  While the termination request was on hold, Frysztacki was replaced by RSM Michael Baimba.

In February 2016, Defendant opened an investigation into another RSC, Brenda Harmon, ultimately concluding that she knowingly took meal breaks and failed to ensure her time cards were accurate.  Harmon received a Final Written Warning in March

2016.  Plaintiff alleges that Harmon also sought disability
benefits.  The parties dispute whether Harmon was terminated.

Plaintiff returned to work on August 29, 2016.  The parties
dispute whether Plaintiff could have come back before this date.
Plaintiff alleges that Defendant was unwilling to accommodate
his restrictions.  Defendant maintains that it was not possible
to accommodate his restrictions.  The parties agree that
Plaintiff was told that if he could not hold a tablet in his
right hand, he could not perform his duties and could not come
back to work.

The parties also agree that during his first two weeks back
at work, Plaintiff had limited use of his right hand, which was
in a splint and a sling.  Plaintiff could neither sit nor stand
for long periods of time, as would be required to work on the
sales floor.  Instead of immediately resuming his usual duties,
Plaintiff completed web-based trainings.  The parties dispute
whether Plaintiff was required to complete the trainings he had
missed during his absence, or if this was a discriminatory
decision made by Defendant.  Plaintiff contacted Baimba and
Menster regarding his concerns about not returning to the sales
floor, but was not provided with an explanation other than being
told he needed to complete the trainings.

On September 14, 2016, Menster directed that the
investigation into Plaintiff be re-activated.  Ross interviewed

Rizzolo again, showing Rizzolo surveillance video of Plaintiff conducting the allegedly improper personal purchase.  On September 15, 2016, Ross interviewed Plaintiff, offering him an opportunity to review the summary of information Plaintiff had previously provided.  Plaintiff stated that the summary accurately reflected his answers.  The parties dispute whether this interview was the first time Plaintiff offered an alternative explanation about the personal transaction by claiming he was participating in a fundraiser.  Following this interview, Plaintiff was suspended pending conclusion of the investigation.  At this time, Plaintiff was also given a Final Written Warning for violations of the Code for his pre-leave failures to record his time.  Defendant alleges that it could have terminated Plaintiff immediately for his conduct, but opted for a Final Written Warning instead.

On September 19, 2016, Ross completed his investigation into Plaintiff's personal transaction and determined it created a conflict of interest in violation of the Code.  Following this decision, Director of Sales, Danny Perez, made the final decision to terminate Plaintiff's employment after consulting with ARSM Chris Massanova and Menster.  Defendant terminated Plaintiff's employment on October 19, 2016 for the personal transaction/conflict of interest Code violation.

When he was informed of this decision, Plaintiff stated that he believed he was terminated because of his injury. Plaintiff further stated that he thought Defendant did not want him to apply for workers' compensation benefits nor did Defendant want to approve these benefits.  Plaintiff has admitted that he does not know who decided to terminate him and that no one in AT&T management made any negative comments to him about his injury.  However, the parties dispute whether members of AT&T management made comments to other employees about Plaintiff's injuries.[2]

Plaintiff asked his union to grieve both the Final Written Warning and his termination.  The Union denied both requests. Plaintiff does not know of any other employee who was accused of engaging in a conflict of interest or who sought workers' compensation benefits.

Plaintiff filed this claim on June 22, 2018.  Plaintiff alleged two counts: (1) termination due to disability in violation of the New Jersey Law Against Discrimination; and (2) worker's compensation violation.  Plaintiff seeks equitable relief, back pay, front pay, loss of benefits, compensatory

---

[2] Specifically, Plaintiff alleges that then-RSC Miguel Ruiz said that Plaintiff's medical leave was "delaying the inevitable" and that Plaintiff "was going to get fired anyway."  Plaintiff further alleges that ASM Koenig, ASM Waligorski, and RSM Frysztacki also made negative comments about Plaintiff's workers' compensation claim.

11

damages, punitive damages, enhanced attorney's fees and costs, civil penalties, interests and other such relief as the Court may deem proper.  Following discovery, Defendant filed a motion or summary judgment on January 10, 2020.  This matter has been fully briefed and is ripe for adjudication.

**ANALYSIS**

A. Subject Matter Jurisdiction

The Court has diversity jurisdiction over this case under 28 U.S.C. § 1332, as there is complete diversity between the parties and the amount in controversy exceeds $75,000.

B. Standard for Summary Judgment

Summary judgment is appropriate when the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits if any,' . . . demonstrate the absence of a genuine issue of material fact" and that the moving party is entitled to a judgment as a matter of law.  Celotex, 477 U.S. at 322-23 (citing Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such that a reasonable jury could return a verdict in the nonmoving party's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" if, under the governing substantive law, a dispute about the fact might affect the outcome of the suit.  Id.  "In considering a motion for summary

judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" Marino v. Indus. Crating Co., 358 F.3d 241, 247 (3d Cir. 2004) (citing Anderson, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.").

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 324. A "party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading[s].'" Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001). For "the non-moving party[] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will

bear the burden of proof at trial.'" Cooper v. Sniezek, 418 F.
App'x 56, 58 (3d Cir. 2011) (citing Celotex, 477 U.S. at 322).
Thus, to withstand a properly supported motion for summary
judgment, the nonmoving party must identify specific facts and
affirmative evidence that contradict those offered by the moving
party. Anderson, 477 U.S. at 257.

   C. Defendant's Motion for Summary Judgment

      1. Plaintiff's Discriminatory Termination Claim

      The New Jersey Law Against Discrimination (NJLAD) prohibits
employers from discriminating in the "terms, conditions, or
privileged of employment" on the basis of a person's disability,
N.J.S.A. 10:5-12(a), "unless the handicap precludes the
performance of employment." Failla v. City of Passaic, 146 F.3d
149, 153 (3d Cir. 1998) (citing § 10:5-4.1). Analysis of claims
made pursuant to the NJLAD generally follow the analysis used
for Title VII claims. Schurr v. Resorts Int'l Hotel, Inc., 196
F.3d 486, 498 (3d Cir. 1999). While the NJLAD prohibits any
unlawful employment practice against a handicapped person, it
also "acknowledges the right of the right of the employers to
manage their businesses as they see fit." Viscik v. Fowler
Equip. Co., 800 A.2d 826, 833 (N.J. 2002) (citing N.J.S.A. 10:5-
2.1).

      To establish a prima facie cause of action for disability
discrimination under the NJLAD, Plaintiff must show that (1) he

was disabled within the meaning of the statute, (2) he was otherwise qualified to perform the essential functions of the position of employment, and (3) he suffered an adverse employment action because of the disability. Gavin v. Haworth, Inc., 2016 WL 7325474, at * 6 (D.N.J. Dec. 16, 2016) (citing Victor v. State, 952 A.2d 493, 503 (N.J. Super. Ct. App. Div. 2008), aff'd as modified, 4.A.3d 12 (N.J. 2010)). Each of these elements must be shown, including proof of some material adverse change in the conditions of employment. See Jones v. Sch. Dist., 198 F.3d 403, 411 (3d Cir. 1999); Victor, 952 A.2d at 504. The Court uses the McDonnel Douglas burden-shifting framework to assess this claim. Schummer v. Black Bear Dist. LLC, 965 F.Supp.2d 493, 498 (D.N.J. 2013).

This framework has three basic steps and each with its own separate analysis. Hicks v. New Jersey Department of Corrections, et al., No. 3:16-cv-00927, 2019 WL 5587324, at * 4 (D.N.J. Oct. 30, 2019). First, a plaintiff must put forward a prima facie case of discrimination by a preponderance of the evidence. Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (3d Cir. 2003). If a plaintiff succeeds at this step, the analysis continues to step two, where the burden shifts to the defendant to provide "a legitimate, nondiscriminatory reason for its actions." Tucker v. Thomas Jefferson Univ., 484 F.App'x 710, 712 (3d Cir. 2012). If the defendant can provide such an

15

explanation, the analysis proceeds to the third step.  At this step, "the inference of discrimination drops and the burden shifts back to the plaintiff to show that the defendant's proffered reason is merely a pretext for intentional discrimination."  Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008).  If each side meets its burden at each stage, then summary judgment is inappropriate.  Whishkin v. Potter, 476 F.3d 180, 185 (3d Cir. 2007).

Plaintiff's Prima Facie Case

Defendant argues that Plaintiff cannot establish a prima facie case because he cannot establish that he was terminated because of his disability.  Defendant further argues that Plaintiff cannot show that Defendant sought someone else to replace him after his termination, which it asserts is an essential element of Plaintiff's prima facie case.

Plaintiff argues that he can establish a prima facie case of discrimination because Defendant inconsistently applied its policies.  Plaintiff also asserts that there is a genuine issue of material fact as to who made the decision to terminate him.  Plaintiff also points to the delays between discovery of Plaintiff's alleged wrongdoing, opening an investigation, and the ultimate decision to terminate him as evidence that Plaintiff's violations of the Code were pretextual and not as urgent as Defendant presented.

The Parties do not dispute that Plaintiff was handicapped or disabled within the meaning of the statute.  The Parties also do not dispute that Plaintiff was qualified to perform the essential functions of his employment.  The Parties do dispute that Plaintiff suffered an adverse employment action because of his handicap or disability.  Defendant also argues that Plaintiff cannot demonstrate that Defendant sought another to perform the same work after Plaintiff had been removed from the position.[3]

The Court finds that Plaintiff has failed to establish a prima facie case of discrimination.  Plaintiff has produced little evidence to support his claim that he was terminated because of his disability.  Plaintiff does not deny that he failed to follow Defendant's Code and timekeeping procedures on multiple occasions.  Plaintiff does not deny that he was given several warnings about his failure to comply with the Code

---

[3] In other cases before this Court, we have declined to require that a Plaintiff show that he or she was replaced in order to sustain a claim for discrimination under the NJLAD.  See Gavin, 2016 WL 7325474 at *6.  The Court also notes that the New Jersey Appellate Division has recognized that "[t]here is only a subtle difference between replacement and retention.  To differentiate based upon the replacement of a new employee or the substitution of an existing employee is, at best, to rely on semantics." Ehmann v. Sea Spa, LLC, 2005 WL 3439935, at * 4 (N.J. App. Div. Dec. 16, 2005).  Because this Court has not required this prong in the past and Plaintiff has failed to establish a separate prong of his prima facie case, the Court will decline to rule on this issue.

17

before he was forced to take a leave of absence because of his injury.  Though Plaintiff argues that Defendant did not wish to approve his workers' compensation benefits, resulting in his termination, Plaintiff has not introduced sufficient evidence to create a genuine dispute of material fact with regard to this allegation.

While Plaintiff alleges that several employees disparaged his job performance and questioned the severity of his injury through offhand comments or private conversations, Plaintiff has not shown that these conversations motivated or informed Defendant's decision to terminate him.  Specifically, Plaintiff alleges RSC Ruiz commented on the "inevitability" of Plaintiff's termination.  The Court notes that RSC Ruiz did not have a formal role in the investigation into Plaintiff's behavior nor did Ruiz contribute to the decision to terminate him. Plaintiff's allegations that ASMs Koenig and Waligorski and RSM Frysztacki made negative comments about his injury are similarly not material.  Frysztacki was no longer employed by Defendant at the time that the decision to terminate Plaintiff was made. Likewise, ASMs Koenig and Waligorski also played limited roles in the investigation into Plaintiff's personal transaction and timekeeping practices.

The decision to terminate Plaintiff following his return to work was based on the conclusion of two investigations into

Plaintiff's adherence to Defendant's timekeeping procedures and Defendant's policy about conflicts of interest in personal transactions.  While Plaintiff's disability may have altered the timeline of the interviewing, investigating, and ultimate decision-making process, the Court finds that Plaintiff did not suffer an adverse employment action because of his disability.

Because Plaintiff has not met his burden at step one of the McDonnel Douglas analysis, the Court need not continue to steps two or three.  The Court will grant Defendant's motion for summary judgment with respect to this claim.

2. Plaintiff's Workers' Compensation Claim

Plaintiff's second claim is governed by the New Jersey Workers' Compensation Act.  See N.J. Stat. Ann. § 34:15-39.1 ("It shall be unlawful for any employer or his duly authorized agent to discharge or in any manner discriminate against an employee as to his employment because such employee has claimed or attempted to claim workmen's compensation from such employer . . .").  To establish a prima facie case for this claim, Plaintiff must show that he (1) made or attempted to make a workers' compensation claim; and (2) he was discharged or discriminated against in retaliation for making the claim. Conlon v. Ryder Sys., Inc., 2014 WL 5843421, at *7 (D.N.J. Nov. 12 (2014) (citing Cerracchio v. Alden Leeds, Inc., 223 N.J. Super. 435, 442 (N.J. App. Div. 1988) and Lally v. Copygraphics,

173 N.J. Super. 162, 176-77 (N.J. App. Div. 1980)).  To analyze
a worker's compensation claim, the Court looks for a causal
connection between the workers' compensation claim and the
employee's discharge.  Id. (citing Carter v. AFG Indus. Inc.,
334 N.J.Super. 549, 557 (N.J. App. Div. 2001)).  Under New
Jersey law, the timing of discharge may be a significant factor
in determining causation between an employee's workers'
compensation claim and the employee's discharge.  Morris v.
Siemens Components, Inc., 928 F.Supp.486, 494 (D.N.J. 1996).
However, timing alone cannot raise an inference of causation
sufficient to establish a prima facie case.  Id.

     The Court finds that Plaintiff has failed to establish a
prima facie case of workers' compensation retaliation.  The
parties do not dispute that Plaintiff made a workers'
compensation claim in December 2015 following his fall and
subsequent injury.  However, looking at the timing of
Plaintiff's termination, Plaintiff has not introduced sufficient
evidence to show that he was discharged or retaliated against
for making this claim.  While Plaintiff alleges that Defendant's
stated reasons for termination were pretextual because Defendant
waited to finish its investigations and terminate him until
after he returned to work, this explanation is not persuasive.
Plaintiff has admitted that RSM Frysztacki immediately assisted
him in filling out a incident report in order to claim workers'

compensation benefits.  Plaintiff has also admitted that he
received workers' compensation benefits from December 2015 to
August 2016.  Plaintiff was not terminated until October 2016,
after two separate investigations into his conduct were
completed.  These investigations show that Plaintiff had a
significant and well-documented history of failing to follow
Defendant's timekeeping procedures and that Plaintiff created a
conflict of interest by entering into a personal transaction
with a customer.

In examining circumstances beyond the timing of Plaintiff's
termination, Plaintiff still has not introduced sufficient
evidence to create a causal connection between his workers'
compensation claim and his discharge.  Plaintiff has not alleged
that anyone in Defendant's management made negative comments
about his workers' compensation claim or benefits.  Plaintiff
has not alleged that Defendant opposed Plaintiff's workers'
compensation claim, but rather that Defendant's workers'
compensation administrator, Sedgwick, opposed his claim.
Defendant has explained that according to its policies and
general practices, termination decisions are typically stayed
when an employee is on medical leave.  Though Plaintiff
questions the veracity of this explanation, he has not offered
evidence to demonstrate that this policy is either
inconsistently enforced or pretextual.  In sum, though Plaintiff

may question the timeliness and thoroughness of Defendant's
investigations and termination decision, the Court finds that
these details are insufficient to prove causation in support of
his workers' compensation retaliation claim.

The Court will grant Defendant's motion for summary
judgment with respect to this claim.

<u>**CONCLUSION**</u>

For the reasons stated above, the Court will grant
Defendant's motion for summary judgment.

An appropriate Order will be entered.


Date: <u>September 25, 2020</u>          <u>s/Noel L. Hillman</u>
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.